13320.    LOWE *v.* PAYNE, director-general.

Under the evidence in this case the plaintiff was not entitled to recover for the homicide of her husband, who was killed by a train when he was sitting or lying on or near the railroad-track; and the court did not err in directing a verdict for the defendant.

DECIDED DECEMBER 10, 1923.

Action for damages; from Talbot superior court—Judge Munro. December 19, 1921.

The only eye-witness of the homicide was the locomotive engineer on the defendant's train, who testified as follows: "I am a locomotive engineer on the Central, and have served as such for twenty-five years. At present I am running the 'Dixie Flyer' between Macon and Albany. Up to November, 1920, I was on Nos. 1, 2, 3, and 4 between Macon and Columbus. No 3 is the train that leaves Macon at 2:45 in the morning and Columbus at 6:10. No. 2 leaves Columbus at 1:10, and due in Macon at 4:45; leaves there at 9:20 at night, and due at Macon at 1. No. 1 is the train that leaves Macon at 12:25, and due in Columbus at 4:15. The even-numbered trains on the Central Railroad go towards Savannah, and the odd-numbered ones west. I have been operating trains between Macon and Columbus on passenger schedule for five years and four months prior to August, 1919. I am familiar with the territory between Columbus and Macon as observed from the engine, and I am familiar with the territory between Juniper and Box Springs. In August, 1919, trains were operating on what we call fast time. The train was scheduled to arrive at Juniper on the date of the Jim Lowe accident at 5:15 o'clock, which would be equivalent to 4:15 under the old time. It was not bright daylight when we arrived at Juniper, and the headlights on the engine were burning, because it was dark. The train stopped at Juniper that day. Mr. Claude Giger was the fireman, and Mr. Walter Little

was the conductor. My seat was on the right side in the cab of the engine as we left Juniper going west towards Columbus. The fireman was firing when we left Juniper. The train struck a man on the fill west of Juniper. As to whether or not I was on the lookout ahead of my engine as I left Juniper, I am always looking ahead. There ain't nobody in the world that keeps his eyes on one place, but you have an opportunity to look ahead. You can look off because you have seen the station that you would cover while you are looking, you understand, but still you might say you seen it all the way. After I left Juniper and took the curve and passed on to the straight line, I was looking ahead. I did not see a man on the track. There was no man on the track. I remember the point where Jim Lowe was struck. I saw a dog as I approached that point. I was within 150 feet of the point when I saw the dog. I was looking through the forward window when I saw the dog. The dog was on the track, and jumped off to my right. I followed the dog with my eye. He did not jump back on the track again. After I saw the dog and saw him jump off the track, I just raised up and cast my head to the side and watched him to see if he come back. During this time there was no man within my vision. There was nothing to excite my suspicion other than the dog which jumped off the track, and I never did see him any more.

"I saw Jim Lowe that night. The first time I saw him was when the front of my engine aroused him and he raised up. He was lying off from the ballast on the track, head towards Columbus. The ballast is at least a foot or a foot and a half off the end of the cross-ties. Just as the front of the engine passed him he raised up. I suppose the fuss aroused him, right at him, and he raised up. He was on his all-fours. Looked like a man trying to scramble up. The step on the tank right behind me struck him, the step that we go upon engine on. At the time it hit him he was just trying to get—like this, on the track, and hit him. The tank step hit him right in there and just knocked him right back where he came from. I stopped the train. I didn't blow any signal when I saw him, didn't have no time to blow no signal. I saw him and hit him all at the same time. The front of the engine had already passed him when I saw him. I put the brakes in emergency and stopped. The train ran about a car and a half further than the train before it stopped. We had five cars and an engine.

that would be six car-lengths, the tank and engine. I went back to where he was. I had a light, a flambeau. I used the flambeau because it was dark. In going back to the point where this party was lying I walked over one of the roughest pieces, I ever had. I had to hold on to the bars underneath the train and pull myself along over that ballast to get back to him. Conductor Little was with me. When we got back to where he was, he was lying down. He was lying on his back, I suppose six feet from the track. If it had not been for the weeds and bushes, it would have knocked him down the embankment. I smelled whisky. As to whether it was very pronounced or not, it was pretty good, pretty good scent of it. In trying to arouse him, I called him three or four times, and the dog tried to bite me, and I got Walter Little to arouse him. As I had an excuse to go back to the engine, I let them handle him when the dog got mad. I went to the back of the train, and pulled the cord, and backed the train up to the baggage-car, and picked him up and carried him on. The fireman backed the train for me. The fireman is really an engineer, but was firing for me during dull business. I don't know who helped put him on the baggage-car. I didn't do that myself.

"This territory going towards Columbus is down grade. The train was dead on time. I had been running the schedule, arriving at Juniper at 5:12 a. m. ever since I had been on it. It would vary sometimes two or three minutes, five or ten up to fifteen, along in there, but not later than fifteen or earlier than ten since I had been on it. I have been on this run for five years and four months, and it had been running a schedule of arriving at Juniper at 5:12 all of this time. This train was not running over or beyond the schedule time after leaving Juniper. I did not blow the whistle as I approached the place where Jim Lowe was struck, because I saw nothing to give me any indication that there was trouble ahead. During the time that I have been on trains Nos. 1, 2, 3, and 4, I never saw any one on the track at or near this place between Juniper and Box Springs. I stated earlier in my testimony that in going back to where this party was struck, it was a bad walkway, and that I hung on to the truss-rods to give myself a good footing. I did not want to slip and fall down that hill on that slag, and I just held on to the truss-rods so that I would not go down hill. The slag went out to the side, and I had to walk

over it. I could hold on to the truss-rods and step on a tie here and there, and I didn't have to bother with the slag. That slag is liable to roll with you. I was holding to the rods and stepped from cross-tie to cross-tie. That enabled me to keep off the slag. As to whether this picture, marked No. 1 at the bottom in ink, represents the locality where the accident occurred, it is just a straightaway piece of track. You haven't got any curve or station or anything. At the point where the accident occurred it was on a straightaway. I don't think it would be possible for a man to swear to that piece of track when you haven't got anything in the world to identify that piece of track. That is the appearance of the track at that place—the slag and rails and embankment. I cannot say whether that is the particular place. That morning the train stopped at Juniper. As the train approached the station I blowed the whistle and the conductor pulled the line, and I answered three short blasts. The station signal is a long blast of the whistle. I got a signal from the conductor to stop, and answered by three short blasts, and following that the train came to a stop. On leaving Juniper, the conductor pulled the line and the fireman rang the bell, or I rang it. That is designed merely to give notice that we are moving off. Don't ring it for any considerable extent of time, just ring it to let them know we are starting. The train I was running has regular steel and iron wheels and rails to run on like any other train. The fireman rang the bell that morning. I did not state a moment ago that the fireman was firing the engine. When the accident occurred he was firing. I said it was a white fireman.

"I couldn't say how far my engine was at the time I stopped after the accident, in reference to the bridge down there. I was six cars from the negro. I counted the cars back of what I had, and I had five. He was about one car-length back of that. We had gone pretty close to the culvert. I didn't say we were right on it —pretty close to it. I would say it was about three-quarters of a mile from the station down to the culvert. I said I was looking forward through the front and saw the dog. The headlight is put on there for the purpose of letting me see down the track. The dog ran across the track 150 yards from the place where Jim Lowe was struck by my engine. [A correction of this statement and of similar statements as to the distance—"150 yards"—was made

by the witness at the close of his testimony, it being then stated that the distance was 150 feet.] I was 150 yards from the dog when he ran across the track. He was towards Columbus and I was towards Macon. It was 150 yards from where the dog went across the track to the point where Jim Lowe was lying. Talking about where I was and not about where the dog was, the dog went across right where I saw the man, right at the same place. I saw this dog by my light 150 yards. I don't know as we have got any particular instructions when we see an animal on the track. We have a danger signal. We are not instructed to blow that. We do blow it when we see they are on the track and ain't going to get off. I did not blow at this dog. My fireman had plenty of time to quit ringing the bell and start shoveling coal before we got to this man. We were sailing down on the straightaway there. I said that when Jim Lowe got up there he scrambled upon his all-fours trying to get on the track, coming that way. I said he raised up just as the head of the engine passed him—explaining how he tried to get on the track when the head of the engine had passed him—and the space was so narrow there that I had to hold on to the side to keep from rolling down the hill. Anybody, if he is lying down, can get up like this, and let it hit him in the side. I had to hold to the train to get across the cross-ties. The slag was over on the brow of the hill. He scrambled up from the edge of the slag like this. Like this is the track and this is the slag and this is the rail (indicating). Here is your slag, here is your cross-ties, and here is your rail. I couldn't walk on the place where he was lying, because there were weeds and bushes. There was no level place of any sort along there, nothing only what was covered with bushes and weeds.

"In answer to how I could look over the side of my engine and see a man lying in that position when there was no place for a man to walk, I did not say I saw him lying. I saw him getting up. When he raised up he was as high as the cross-ties, and I can see the cross-ties. You can look ahead down and take in the whole vision from your side window. You can't see the end of the cross-ties when the head of your engine has passed the cross-ties, but you can see right there. I said he got up when the head of my engine had passed. I could see him because he was up at the end of the cross-ties. I was looking out of the window like this (indi-

cating). I could see him out there. From where I was sitting to the head of my engine it is between 38 and 40 feet. I followed him. He began to scramble up just as the head of the engine got with him. My light were amply strong to see the dog. I saw the dog cross all right. When the train hit the man, I could see him just as good as I can see right down there. I saw him clearly. Between the time I saw him and the time the train hit him I just looked at him, that was all. Applied my brake and emergency and watched him. Between the time I saw the dog and the time I saw the man, I was just watching the place where the dog went off the track.

"I never have seen a man pass along there yet. I wouldn't say there was never anybody passed there. I say I have never seen them. I never have seen a person on the track there to get off. I did not see the path there. I don't see much in the path line. . . When I went back to Jim Lowe with my light, I really could not say how he was dressed. I know his clothes were dark clothes. There wasn't nothing light about them. I didn't stay there until they got him out of the bushes, you understand. The first I saw of him was when he raised up. In stating to Mr. Bradley that I saw. his as plain as I can see down there, I did not mean by that that it was as light then as it is now. The only reason that I could see him was from my light overhead, showed down there. I think we have got four lights in my cab. There is one at the steam-gauge and one at the water gauge, and one up over the engineer's box. There are windows both to the front and the side.

"My attention having been called to the fact that during my cross-examination I stated—not once, but several times—the distance that I saw the dog in front of the engine was 150 yards, I made a mistake. It was 150 feet instead of yards. I just had the yards crossed on my mind, and if you don't believe I am fair in it —my statement—I can show you where I made it in there to the railroad company, 150 feet." There was other testimony indicating that the deceased must have been drinking intoxicating liquors prior to the accident.

*F. U. Garrard, W. R. Flournoy, A. S. Bradley,* for plaintiff.

*Battle & Arnold,* for defendant.

JENKINS, P. J. (After stating the foregoing facts.) It indisputably appears from the record in this case that the deceased, at the time he was struck and killed by the train, was sitting or lying

in an exposed position on or near the railroad track, and that this conduct on his part was unexcused and unexplained, save that it appears that he had been drinking intoxicating liquors. The Supreme Court, in answer to questions propounded to it in this case, has ruled that under such circumstances a deceased person would be lacking in ordinary care to prevent the consequences to himself of the defendant's negligence; that under such circumstances the defendant could not be held liable for the homicide, except on the theory that it was guilty of wilful and wanton negligence; and that, in the absence of any special facts and circumstances such as might vary the general rule, the failure of the defendant to anticipate and discover the presence of the deceased on the track, so that the defendant could thereafter use all ordinary and reasonable means to protect him, could not amount to wilful and wanton negligence, even though the homicide may have occurred at a time when and at a place where the defendant was under the duty of anticipating the presence of trespassers on the track. *Lowe* v. *Payne,* 156 *Ga.* 312 (118 S. E. 924). Since a failure on the part of a railroad company to anticipate and discover the presence of trespassers on its track at a time and place when it was under a duty to anticipate them cannot of itself amount to wilful and wanton negligence, it follows that the action of the trial judge in directing a verdict in favor of the defendant must be affirmed; for the reason that it appears, without dispute, that the operatives of the train were unaware of the presence of the deceased on or near the track until after it was too late to avoid the injury, and since the degree of blame chargeable from its neglect of duty in failing to discover his presence is not augmented by reason of any proved fact or circumstance, beyond the one disputed contention that it was the duty of the company to anticipate the presence of trespassers at the time and place of the homicide, and since no other fact or circumstance appears which could possibly indicate wilful or wanton negligence.

The homicide did not occur at a public crossing, or even at a private crossing, but the record shows that the deceased had undertaken to walk down the defendant's track from one small station to another, about three miles distant, and that the homicide occurred on the private right of way. The allegation, supported by evidence, that pedestrians were accustomed thus to make use of

the defendant's right of way between the two named stations would not render the defendant company guilty of wilful and wanton negligence in failing to continuously blow the whistle or ring the bell while running trains from one of these stations to the other. The petition alleged that the train was traveling at an excessive speed of forty miles per hour. This, under the facts of the case, could not constitute wilful and wanton negligence; and besides, the only evidence as to speed was the testimony of the engineer, who swore that the train was on schedule time and running at a speed neither above nor below the usual schedule speed. If the presence of the deceased on the track in an apparently incapacitated condition had become known to the operators of the defendant's train, so that by the exercise of ordinary and reasonable diligence they could have thereafter prevented the injury, the rule would be different, since in such a case wilful and wanton negligence might be chargeable against the company. *Charleston & Western Carolina Ry. Co.* v. *Johnson,* 1 *Ga. App.* 441 (57 S. E. 1064). *Judgment affirmed. Stephens and Bell, JJ., concur.*